**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ANITA KEITH-FOUST, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA CENTRAL | ) |
| UNIVERSITY; UNIVERSITY OF | ) |
| NORTH CAROLINA; DONALD W. | )    1:15CV470 |
| CORBETT; KESHA T. LEE; DR. | ) |
| DEBRA SAUNDERS-WHITE; | ) |
| DARRYL K. LESTER; DR. DONNA C. | ) |
| KORNEGAY; STEPHANIE B. | ) |
| WILLIAMS; and PHYLISS CRAIG- | ) |
| TAYLOR, in their individual and | ) |
| official capacities, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Motion to Dismiss Amended

Complaint ("Motion") [Doc. #28] by Defendants North Carolina Central University

("NCCU"), University of North Carolina ("UNC"), Donald Corbett, Kesha T. Lee, Dr.

Debra Saunders-White, Darryl K. Lester, Dr. Donna C. Kornegay, Stephanie B.

Williams, and Phyllis Craig-Taylor (collectively referred to as "Defendants"). In her

Amended Complaint, Plaintiff Anita Keith-Foust, a former student at NCCU, alleges

the following claims: violation of Title II of the Americans with Disabilities Act

("ADA") against "Defendants"[1] (Count 1); violation of Section 504 of the

---

[1] Some allegations within Count 1 refer specifically to "Defendant NCCU", while other allegations refer to "Defendants". (See Am. Compl. ¶¶ 136-61.)

Rehabilitation Act against "Defendants"[2] (Count 2); retaliation in violation of the ADA against NCCU, UNC, Corbett, Saunders-White, Williams, Craig-Taylor, and Lester (Count 3); retaliation in violation of the Rehabilitation Act purportedly against the same defendants as in Count 3 (Count 4); tortious interference with contract against Corbett (Count 5); fraud against NCCU, Corbett, Lee, Kornegay, and Saunders-White (Count 6); negligence against Lee, Kornegay, Lester, Craig-Taylor, and Williams (Count 7); negligent misrepresentation against Lee and Kornegay (Count 8); and unfair and deceptive trade practices against Corbett (Count 9). (Verified First Am. Compl. ("Am. Compl.") ¶¶ 136-265 [Doc. #20].)

Defendants argue that Counts 1 through 4 alleging violations of the ADA and Rehabilitation Act are barred by the statute of limitations and otherwise fail to state a claim; those same counts against individual defendants in their individual and official capacities should be dismissed because the statutes do not allow claims against individuals; Counts 5 through 9 against NCCU, UNC, and individual defendants in their official capacities should be dismissed on Eleventh Amendment and sovereign immunity grounds; Counts 5 through 8 should be dismissed for failure to state a claim and based on public official immunity; and Count 9 should be dismissed for failure to state a claim.

---

[2] Some allegations within Count 2 refer specifically to "Defendants UNC and NCCU", while others refer to "Defendants" and "Defendant". (See id. ¶¶ 145-152.) In addition, the paragraph numbering for Count 2 is duplicative, in part, of previous paragraphs, because it begins with paragraph 145 instead of paragraph 162. Therefore, there are two of each of the following paragraphs in the Amended Complaint: 145 through 161.

For the reasons to be explained, Defendants' Motion is denied in part and granted in part. Keith-Foust has sufficiently stated, at least in part, allegations that NCCU violated the ADA and Rehabilitation Act. While the alleged failures to accommodate that took place before June 11, 2013 are time-barred, those and other alleged discriminatory acts, if any, occurring on or after that date are timely. Because Defendants did not challenge the sufficiency of the allegations of the timely discriminatory conduct that took place during or as a result of PBAP, presumably because they believed all of those allegations would be deemed time-barred, the sufficiency of those allegations has not been addressed, and, as such, they stand. As it relates to Defendants' pleading challenges, though, Keith-Foust has sufficiently alleged that the delayed provision of accommodations for her MPA class supports her discrimination claims under the ADA and Rehabilitation Act. However, allegations of constructive discharge in support of such claims fail. Likewise, her allegations of Lester's delay in accommodating her do not sufficiently allege retaliation, and FERPA does not provide a private cause of action for the alleged retaliatory delay in providing her access to her education records. Furthermore, Keith-Foust's ADA and Rehabilitation Act claims against the individual defendants in their official and individual capacities are dismissed. Unlike the ADA and Rehabilitation Act claims that remain in part, the tort and unfair and deceptive trade practice claims are dismissed in their entirety.

3

I.

For purposes of this Motion, the well-pled facts are taken as true. <u>See</u> <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 255 (4th Cir. 2009). Keith-Foust has a commendable academic history at NCCU. She has obtained two undergraduate degrees – in 1979 with a major in Business Administration and in 2013 with double majors in Psychology and Political Science– from the school. (Am. Compl. ¶¶ 15, 17.) She attended NCCU on a merit scholarship, was a member of several honor societies, participated in a number of professional organizations, and helped organize after-school, athletic, and sustainability programs. (<u>Id.</u> ¶¶ 18-20.) Keith-Foust is also visually impaired. (<u>Id.</u> ¶ 21.) In her twenties, she was diagnosed with glaucoma, and in March 2012, she was diagnosed as legally blind. (<u>Id.</u> ¶¶ 21, 23.)

In the spring of 2013, she applied for admission to NCCU's School of Law. (<u>Id.</u> ¶ 24.) In spite of her accomplishments and grade point average of 3.70, NCCU did not offer Keith-Foust unconditional admission into the School of Law even though it offered unconditional admission to non-disabled students with comparable credentials. (<u>Id.</u> ¶ 27, 28, 29.) Instead, NCCU admitted her into its Performance-Based Admission Program ("PBAP") for the summer of 2013, specifically June 3 through June 14. (<u>Id.</u> ¶ 28.) PBAP is offered to a select number of applicants who do not qualify for unconditional admission, but whose records show promise of success in law school. (<u>Id.</u> ¶ 30.) It is a two-week program during which students attend class and then are evaluated for admission

4

to the School of Law based on their academic performance and professionalism during the program. (Id. ¶ 31.)

Since 2008, Keith-Foust required reasonable accommodations during her enrollment at NCCU and had met with NCCU's Office of Disability Services prior to the start of each semester to request and develop an accommodations plan. (Id. ¶¶ 22, 35.) Therefore, before the start of the PBAP, on May 24, 2013, she met with NCCU's Office of Disability Services and Defendant Dr. Donna Kornegay, the Director of Wellness at the School of Law and liaison to Student Disability Services, to request and develop an accommodation plan. (Id. ¶¶ 8, 34.) Keith-Foust requested the following accommodations for PBAP: special seating in the front of the classroom, access to a table for her equipment, recorded lectures (for which she would provide the device), use of her personal laptop/equipment, absences for medical appointments (documentation required), electronic copies of handouts/class materials (via e-mail) sent before class, an oral description of videos shown in class as needed, a personal assistant in class to provide reader services, extended time on exams/tests (double time), separate setting for all exams/tests, use of a laptop to access assistive technology on tests, and extended time on assignments as needed (two additional days). (Id. ¶ 36.a.–l.) NCCU did not object to any of the accommodations and orally agreed that Keith-Foust was entitled to these accommodations during PBAP. (Id. ¶¶ 37, 38.) Ultimately, NCCU determined that these accommodations were reasonable to afford Keith-Foust equal access during PBAP and included the accommodations in an

Accommodations Plan. (See Accommodations Plan for PBAP ("Accommodations Plan" or "the Plan"), Ex. A to Am. Compl. [Doc. #20-1]; Am. Compl. ¶ 38.) Defendant Kesha Lee, Director of Student Disability Services, and Kornegay told Keith-Foust that the Accommodations Plan was the official plan that would be used during her enrollment in PBAP and that she would be provided all of the accommodations under the Plan. (Am. Compl. ¶ 39.) Although not among Keith-Foust's requested accommodations (see id. ¶ 36), Lee also told her that she would be provided a CCTV; however, Lee later informed her that the CCTV would not be provided due to administrative issues, and it was not included in the Plan. (Id. ¶ 40.) Dr. Kornegay signed the Accommodations Plan on May 29, 2013, and Keith-Foust signed it May 31, 2013. (Id. ¶ 41; Accommodations Plan for PBAP.)

On May 30, 2013, Defendant Donald W. Corbett, Associate Dean for Academic Affairs at the School of Law, e-mailed Keith-Foust a memorandum, the purpose of which was to provide her with an overview of PBAP and outline how her Accommodations Plan would be implemented. (Am. Compl. ¶¶ 4, 71, 72.) Although Corbett specifically mentioned the Accommodations Plan and never purported to alter or supersede it, he explained how some, but not all, of Keith-Foust's accommodations would be implemented. (Id. ¶¶ 73, 74.) He did not mention the accommodations of providing for an oral description of videos shown in class, access to a table for equipment, or providing for extended time on assignments. (Id. ¶ 75.)

6

Unbeknownst to Keith-Foust at the time, Corbett responded to an e-mail from one of Keith-Foust's writing instructors and stated that he "purposely omitted" from his memorandum the accommodation of extended time on assignments because he considered it to be an "impractical request." (Id. ¶¶ 76, 77.) He stated that it would be "better to discourage" her from the idea of receiving extended time on assignments so that it would be not "be an expectation later." (Id. ¶ 78.) He went on to say that if Keith-Foust insisted on being provided extended time on assignments, he would be "forced to tell DK" that he did not believe Keith-Foust was being realistic about what would be expected of her and that law school was not the route for her. (Id. ¶ 79.) It was not until one year later that Keith-Foust first learned of Corbett's e-mail.[3] (Id. ¶ 86.)

Keith-Foust enrolled in PBAP; however, "[t]hroughout the duration of PBAP up until the last day of the program," NCCU failed to accommodate her as it had agreed. (E.g., id. ¶ 43.) NCCU did not provide her with special seating in the front of the class, which required her to arrive much earlier than other students to guarantee preferential seating and, on occasion, ask classmates to relocate. (Id. ¶¶ 43-44, 47.) NCCU held classes in its moot courtroom which only had stadium seating and failed to make available access to a table substantial enough in size to hold Keith-Foust's equipment. (Id. ¶ 45.) Professors did not consistently e-mail her

_____

[3] It is not clear precisely when Keith-Foust first learned of this e-mail – one year after the e-mail, one year after she enrolled in PBAP, or some other time. (See Am. Compl. ¶ 86.)

class materials before class, but, instead, sometimes provided the material via flash drive almost immediately before the start of class leaving little to no time to upload the materials and, other times, did not provide class materials beforehand at all. (Id. ¶¶ 48, 49.)  During mandatory tutoring sessions, her tutors told her that they were not aware they needed to accommodate a blind student and conducted the sessions using class materials that were not in a format accessible to Keith-Foust. (Id. ¶¶ 59, 60.)  She was required to complete a final oral argument during which she, like other students, was allowed to use notes. (Id. ¶¶ 51, 52.)  To do so, however, required access to Keith-Foust's personal equipment, but NCCU failed to provide access to a table to hold her equipment, access to an electrical outlet in the front of the classroom during her argument, and extended time to complete her oral argument. (Id. ¶¶ 53-56.)  Although she used a laptop for her exams as required under the Accommodations Plan, PBAP staff members handwrote her typed exam responses to protect her anonymity because other PBAP participants handwrote their exams. (Id. ¶¶ 63, 64.)  However, the staff members carelessly and inaccurately transcribed Keith-Foust's answers and made costly grammatical errors not present in her typed exam answers. (Id. ¶ 65.)

"Frustrated that Defendant NCCU did not provide her required accommodations during PBAP despite her diligent communications with both Kesha Lee and Dr. Donna Kornegay,"[4] she met with Defendant Dr. Debra Saunders-White,

---

[4] Although Keith-Foust alleges "diligent communications with" Lee and Kornegay, she only generally refers to having communicated with them about NCCU's failure

Chancellor at NCCU, on or about June 20, 2013, nearly one week after the completion of PBAP, to discuss her accommodations. (Id. ¶¶ 6, 97.) Specifically, she said that she had needed access to a CCTV, but that Student Disability Services failed to provide it.[5] (Id. ¶ 98.)

On or about June 28, 2013, Keith-Foust received a letter from Defendant Stephanie Williams, Assistant Dean of Admissions at the School of Law, informing her that she had been denied admission to the School of Law based on an evaluation from PBAP. (Id. ¶¶ 9, 100.) That same day, believing that she was discriminated against on the basis of her disability during PBAP and that her PBAP evaluation was based on her unaccommodated disability, Keith-Foust e-mailed Corbett, copied Saunders-White, and requested a hearing and a copy of her evaluation. (Id. ¶¶ 101, 102.) Corbett replied that there was not a formal appeal process or hearing from decisions not to admit students to the School of Law after their participation in PBAP and copied Saunders-White, Defendant Phyliss Craig-Taylor, Dean of the School of Law, and Williams. (Id. ¶¶ 10, 102.)

Having been denied admission to the School of Law, Keith-Foust enrolled in a fall class in NCCU's Masters of Public Administration ("MPA") program. (Id. ¶¶ 7, 111.) On August 16, 2013, NCCU determined that she required various

_____

to accommodate. (See Am. Compl. ¶ 99 (alleging that she "discussed her accommodations concerns with various defendants during her enrollment, including Defendants Kesha Lee, Donna Kornegay, and Dean Corbett").)

[5] Keith-Foust does not allege that she discussed during this meeting with Saunders-White any other failures to accommodate.

accommodations, including being provided electronic copies of class materials on a jump drive before the start of each class. (Id. ¶¶ 112, 113; Accommodations Plan Fall 2013, Ex. B to Am. Compl. [Doc. #20-2].)  However, NCCU failed to provide these class materials until Keith-Foust notified it on four separate occasions that she was not being provided this accommodation. (Id. ¶ 114.)  Also, despite Lee's assurance in May 2013 that NCCU would provide Keith-Foust with a CCTV during the fall of 2013[6], a CCTV was not provided until months into the fall semester. (Id. ¶¶ 115, 116.)

　　After taking leave during the fall of 2013, Keith-Foust re-enrolled for the fall of 2014 and was supposed to receive accommodations, including receipt of electronic copies of class materials prior to the start of class. (Id. ¶¶ 119, 120; Accommodations Plan Fall 2014, Ex. C to Am. Compl. [Doc. #20-3].)  However, she was not provided with these materials as required until three weeks after the start of classes. (Am. Compl. ¶ 123.)  Keith-Foust took medical leave on or about October 8, 2014, (id. ¶ 124), and apparently did not return.

　　In addition to the aforementioned failures to accommodate Keith-Foust's disability, she also alleges that "Defendant" discriminated against her through

---

[6] Earlier in the Amended Complaint, Keith-Foust also alleges that Lee assured her in May 2013 that she would receive CCTV.  However, the circumstances are slightly different than those alleged in paragraph 115 of the Amended Complaint. Compare Am. Compl. ¶ 40 (describing Lee's assurance on May 24, 2013 that a CCTV would be provided during PBAP enrollment) with id. ¶ 115 (alleging that in May 2013, Lee told Keith-Foust that a CCTV would be provided during the fall of 2013) (emphasis added).

limited accessibility to campus facilities. (Id. ¶ 130.)  While in PBAP, she had to request a key from the security guard to use the elevator within the building, which was time-consuming. (Id. ¶¶ 131, 132.)  The doors to the Criminal Justice Building, where her fall 2013 MPA class was held, that were closest to the handicapped parking remained locked, which required her to walk around the entire building to access the inside or park across the street, the latter of which posed a safety hazard. (Id. ¶ 133.)  The porch of the Taylor Building, where her fall 2014 graduate psychology course was held, had no safety rails, which posed a serious hazard. (Id. ¶ 134.)

"As a result of Defendants' discriminatory and wrongful actions, and intentional violation of [Keith-Foust's] right to reasonable accommodations, [she] was denied admission to the School of Law, was forced to leave the MPA class, suffered economic loss, suffered damage to her career and reputation, and endured substantial emotional distress." (Id. ¶ 135.)

II.

Defendants first argue that the statute of limitations bars Keith-Foust's ADA and Rehabilitation Act claims based on events occurring before June 11, 2013, two years before the date on which she filed her initial complaint, (see Compl. June 11, 2015 [Doc. #1].). (See Defs.' Mot. to Dismiss Am. Compl. [Doc. #28]; Defs.' Mem. in Supp. of Mot. to Dismiss Am. Compl. ("Defs.' Mem. in Supp.") at 8-12 [Doc. #29].)  They challenge Keith-Foust's allegations that NCCU's discriminatory conduct was a continuing violation of the ADA and Rehabilitation

11

Act and argue that her claim accrued on May 30, 2013 when she received Corbett's memorandum and became aware of her denied accommodations. (Id. at 9-11, 12 (citing Am. Compl. ¶¶ 71-75, 128, 129).) Keith-Foust responds that Defendants' conduct was a continuing violation and, thus, even those acts that occurred before June 11, 2013 are not time-barred. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. to Dismiss Am. Compl. ("Pl.'s Resp. Mem.") at 9-11 [Doc. #30].)

Although Defendants refer to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure as the "Dismissal Standards", they do not explain which rule they believe supports this part of their motion to dismiss nor do they discuss either rule as part of their argument that the statute of limitations bars the ADA and Rehabilitation Act claims. (See Defs.' Mem. in Supp. at 6-7, 8-12.) While it is determined that Defendants have moved pursuant to Rule 12(b)(1) to dismiss these claims as time-barred[7], Defendants also do not explain whether they are challenging subject matter jurisdiction facially or factually, despite having referenced both avenues under the heading "Dismissal Standards". (See id.) Nevertheless, after having reviewed Defendants' arguments, it is further determined that they are asserting a facial challenge to subject matter jurisdiction. In other words, they argue that, as alleged, the facts show that the claims are time-barred. (See id. at 1 n.1, 8-12.) When a defendant makes a facial challenge to subject matter jurisdiction, "the facts alleged in the complaint are taken as true,

---

[7] Keith-Foust assumed that Defendants were moving pursuant to Rule 12(b)(1). (See Pl.'s Resp. Mem. at 8-11, 12.)

and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009).[8]

Neither Title II of the ADA nor Section 504 of the Rehabilitation Act contains a statute of limitations; therefore, courts must borrow the statute of limitations from the most analogous state law. See 42 U.S.C. § 1988(a); A Soc'y Without a Name v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011), cert. denied, ___ U.S. ___, 132 S. Ct. 1960 (2012) (addressing Title II of the ADA); McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 129 (4th Cir. 1994), cert. denied, 513 U.S. 1151 (1995) (addressing the Rehabilitation Act).  The parties agree that North Carolina's most analogous statute to the ADA and Rehabilitation Act is the Persons with Disabilities Protect Action ("PDPA"), North Carolina General Statute Chapter 168A. McCullough, 35 F.3d at 130, 132 (addressing the Rehabilitation Act); Dickinson v. Univ. of N.C., 91 F. Supp. 3d 755, 763 (M.D.N.C. 2015) (addressing both Title II of the ADA and Section 504 of the Rehabilitation Act).  Furthermore, the parties agree that the PDPA provides a two-year statute of limitations for non-employment claims. N.C. Gen. Stat. § 168A-12; Dickinson, 91 F. Supp. at 763.

---

[8] Keith-Foust argues that dismissal for lack of subject matter jurisdiction is only warranted if "the material jurisdictional facts are not in dispute" and, because facts such as when she knew or had reason to know of her injury or when her Accommodations Plan was developed are disputed, dismissal is not warranted. (Pl.'s Resp. Mem. at 7-11.)  However, because Defendants are making a facial challenge to subject matter jurisdiction, the facts as alleged are taken as true and, the law and Keith-Foust's own allegations make clear that Defendants' conduct was not a continuing violation.

13

While state law determines the applicable statute of limitations for ADA and Rehabilitation Act claims, federal law determines when those claims accrue. A Soc'y Without a Name, 655 F.3d at 348. "A civil rights claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." Id.

A claim may be brought outside of the limitations period if the plaintiff can establish that it is a continuing violation of the ADA or the Rehabilitation Act. "'In general, to establish a continuing violation[,] the plaintiff must establish that the unconstitutional or illegal act was a fixed and continuing practice.'" Id. (quoting Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991)).

In a much-cited employment case, the Supreme Court addressed the issue of "whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside [the] statutory time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002). The Court focused its analysis on 42 U.S.C. § 2000e-5(e)(1), the provision requiring that a charge be filed within 180 days after the alleged unlawful employment practice occurred, to determine what constituted an unlawful employment practice and when that practice had occurred. Id. at 109-10. Answering what it considered to be the easiest question first, the Court said that a discrete discriminatory or retaliatory act such as termination, failure to promote, denial of transfer, or refusal to hire "occurred" the day it "happened." Id. at 110, 114. "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful

14

employment practice[]'" and "starts a new clock for filing charges alleging that act." Id. at 113, 114. A discrete discriminatory act is not actionable if time-barred, even if it relates to acts that are timely. Id. at 113. However, "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. at 115. Instead, "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117. Therefore, while discrete discriminatory or retaliatory acts are time-barred if the charge is not filed within the statutory time period, a hostile work environment claim is timely "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Id. at 122.

Less than a year later, the Fourth Circuit applied Morgan in a case involving an employer's failure to accommodate in violation of the Rehabilitation Act. In Szedlock v. Tenet, 61 F. App'x 88, 90 (4th Cir. Apr. 3, 2003) (unpublished), the plaintiff was hearing-impaired and used hearing aids and lip reading to compensate, but was not fluent in sign language. In her positions at the Central Intelligence Agency ("CIA"), the CIA provided various accommodations, most of which were ineffective. Id. at 90-91. Meanwhile, the plaintiff requested a number of accommodations, including an oral interpreter or note-taker for large group meetings, which the CIA sometimes provided and other times did not. Id. at 90-91. After the plaintiff filed suit alleging that the CIA violated the Rehabilitation Act for failing to accommodate her disability, the CIA moved to dismiss because, among

15

other reasons, the statute of limitations barred certain violations. Id. at 91-92. In response, the plaintiff argued that the earlier claims were part of a continuing violation and, therefore, were timely. Id. at 93. However, the Fourth Circuit found that "[t]he Morgan decision controls this case" and it "makes clear that unless the plaintiff alleges a hostile work environment (which [the plaintiff] did not do), each instance of discrimination is a discrete act." Id. Furthermore, the early discriminatory actions are not made timely "simply because they resemble later discriminatory actions." Id.

More recently, in an unpublished decision in which the plaintiffs alleged a violation of Section 504 of the Rehabilitation Act in the housing context, the Fourth Circuit explained that "a defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission." Hill v. Hampstead Lester Morton Ct. Partners LP, 581 F. App'x 178, 181 (Aug. 5, 2014). In Hill, Hill was renting a townhouse in a subsidized housing community when her leg was amputated. Id. at 179. In June 2004, she requested a wheelchair ramp to access her townhouse, and the property manager assured her one would be installed. Id. at 179-80. It was not, so in January 2005, Hill requested a wheelchair ramp or a transfer to another unit. Id. at 180. She was promised the opportunity to transfer to a new, handicap-accessible unit once renovations were complete that fall. Id. After she was not transferred to such a unit, she renewed her request in June 2006 and met with the property manager the following month who denied her request for a ramp. Id. In September 2010, she again requested a wheelchair ramp but was told in

16

November that the housing community had no legal obligation to do so. Id.  She

filed sued in February 2012, and the defendants moved to dismiss, arguing that

her claims were barred by Maryland's three-year statute of limitations. Id.  In

addition to arguing that the November 2010 failure to accommodate was an

independently discriminatory act that triggered a new limitations period, Hill also

argued that the repeated denials of her requests for accommodations were a

continuing violation that culminated within the limitation period. Id. at 180, 181.

The Fourth Circuit agreed with Hill that the November 2010 denial was an

independently discriminatory act that triggered a new limitations period. Id. at 180-

81.  The court explained that "[w]hen an individual 'engages in a series of acts

each of which is intentionally discriminatory, then a fresh violation takes place

when each act is committed." Id.  at 180 (quoting Ledbetter v. Goodyear Tire &

Rubber Co., 550 U.S. 618, 628 (2007), superseded in part by statute).  "Each

discrete discriminatory act starts a new clock for filing charges alleging that act.

. . . The existence of past acts and the [plaintiff's] prior knowledge of their

occurrence . . . does not bar [a plaintiff] from filing charges about related discrete

acts so long as the acts are independently discriminatory." Id. at 180-81 (quoting

Morgan, 536 U.S. at 113).  "Thus, a plaintiff who renews a request for a

previously denied accommodation may bring suit based on a new discrete act of

discrimination if the [defendant] again denies [the] request, and the subsequent

denial carries its own, independent limitations period." Id. at 181 (alterations in

original) (internal citations omitted).  Therefore, the November 2010 alleged failure

to accommodate was a discrete act, and, because it took place within the three years immediately preceding the filing of the suit, it was timely. Id.

However, the court disagreed with Hill's argument that the defendants' multiple failures to accommodate constituted a continuing violation. Id. at 180, 181. "The continuing-violation doctrine applies to claims based upon a defendant's ongoing policy or pattern of discrimination rather than discrete acts of discrimination." Id. at 181 (citing Holland v. Wash. Homes, Inc., 487 F.3d 208, 219-20 (4th Cir. 2007); Williams v. Giant Food Inc., 370 F.3d 423, 429 (4th Cir. 2004)). Because the defendant's alleged failures to accommodate were discrete acts, "the continuing-violation doctrine [was] inapplicable." Id.

Not only has the Fourth Circuit applied Morgan outside its Title VII employment context to cases in which plaintiffs allege failures to accommodate in violation of the ADA or the Rehabilitation Act, but other courts have, as well. The United States District Court for the District of Columbia explicitly analyzed the propriety of applying Morgan outside the employment context in Long v. Howard University, 512 F. Supp. 2d 1, 15-17 (2007), aff'd, 550 F.3d 21 (D.C. Cir. 2008). Long, a former Ph.D. candidate, sued Howard University alleging, among other things, violations of the ADA and Rehabilitation Act when it failed to accommodate his disability and imposed discriminatory screening criteria. Id. at 5, 9. In the fall of 1982, Long entered the Ph.D. program and was formally admitted into the program in 1989. Id. at 6. By late 1990, he was diagnosed with pulmonary fibrosis and granted a leave of absence. Id. In July 1995, he submitted an official

18

request to the university requesting that he be reinstated as a graduate student so that he could complete and defend his dissertation, something he believed the university had earlier agreed to do. Id. at 7. In November 1995, the school responded, advised Long to reapply, and reminded him of the time limit on the validity of course credits and the deadline by which to complete his degree. Id. Approximately two years later, Long's wife, on behalf of an ill Long, met with a university attorney, but to no avail. Id. at 8. In April 1998, the dean sent Long a letter in which he did not offer Long the accommodation he requested – reinstatement to defend his dissertation and receive his Ph.D. – but, instead advised him that his candidacy could be restored if he met certain conditions. Id. In June 1999, Long wrote to the university expressing his frustration at the refusals to reinstate him so that he could defend his dissertation. Id. In July 1999, the university responded as it had done before, setting forth the conditions for reinstatement. Id. at 9. Long submitted a formal application for readmission in October 1999 and yet another application in July 2001. Id. In July 2002, Long sued the university, and in March 2004, the university informed him that his request for readmission was denied and that the conditional reinstatement was no longer available. Id. The case went to trial, and a jury found that the defendants violated the Rehabilitation Act but that the statute of limitations barred the claim. Id. at 11. Long moved for a new trial, and the district court's opinion followed. Id. at 5-6.

Long argued, among other things, that he was entitled to a continuing violation jury instruction, but the university argued that Morgan foreclosed such an instruction where there were discrete acts of alleged discrimination. Id. at 15. Long responded that Morgan was limited to employment discrimination cases. Id. After citing circuit court and district court cases that have held that a failure to accommodate under the ADA or Rehabilitation Act is a discrete act under Morgan to which the continuing violation doctrine did not apply, the court found "no principled basis for declining to apply Morgan to denials of requests for reasonable accommodation under the Rehabilitation Act or ADA." Id. at 16 (citing, by way of example, cases from the Ninth, Fourth, and Second Circuits and district courts in Kansas and New York). The court further recognized that "[a]lthough the case law is certainly more abundant in the employment context, Morgan also has been held to apply outside of the employment context because the concept of a 'discrete act' that a plaintiff can readily discern, and for which recourse can then be sought, is not limited to the employment context." Id. at 16-17 (citing cases from the Ninth Circuit and the Eastern District of Pennsylvania). "Unlike a hostile work environment claim, which requires repeated conduct to support a claim, a refusal to provide a requested accommodation can occur in a single action," and "additional actions [are] not necessary to support the discrimination claim." Id. at 17 (internal citation omitted). In other words, "[l]ike a termination or nonpromotion, a refusal to provide the requested accommodation is 'easy to identify' and requires no further adverse action to support a claim. That refusal is

20

thus a 'discrete act' for which the continuing violation doctrine is unavailable." Id. (internal citation omitted).

Here, despite Keith-Foust's allegations, (Am. Compl. ¶¶ 128-29), and argument, (Pl.'s Resp. Mem. at 9-10), that NCCU's discrimination against her was a continuing act that culminated in the letter she received on June 28, 2013 informing her that she was not admitted into NCCU's School of Law, it was not. Instead, as alleged, the failures to accommodate were discrete acts with specific injuries. She alleges that NCCU "failed to accommodate" her "[t]hroughout the duration of PBAP up until the last day of the program" when (1) NCCU did not provide special seating which required her to arrive for class early or ask her classmates to move, "causing much embarrassment and an undesirable strain on her relationship with classmates[,]" or requiring that she "cram her voluminous equipment in the back of the room", (id. ¶¶43-44, 47); (2) NCCU did not provide an adequately sized table for her equipment and she "only had access to a tiny table desk combination, which was insufficient to hold [her] equipment", (id. ¶¶ 45-46); (3) NCCU inconsistently provided her class materials before the start of class and, when it did, it was almost immediately before the start of class leaving "little or no time to upload her materials which inhibited [her] ability to participate meaningfully in the class", (id. ¶¶ 48-49); (4) during oral argument, NCCU failed to provide her access to a table to hold her equipment, an electrical outlet in the front of the classroom, and extended time, which caused Keith-Foust not to perform as well as she would have on her oral argument had her accommodations been

21

provided, (id. ¶¶ 54-57); and (5) NCCU failed to make her tutors aware of her accommodations, which required her to spend additional time making up tutoring sessions, something that her nondisabled peers did not have to do, (id. ¶¶ 59-62).

It would have been readily apparent to Keith-Foust that NCCU was discriminating against her each time it failed to accommodate her. Each discrete act would start a new time period for that act. Therefore, alleged failures to accommodate that took place before June 11, 2013, if any, are time-barred. On the other hand, each alleged failure to accommodate and other discriminatory acts that took place on or after June 11, 2013, if any, are not time-barred. At this stage, though, the Court is unable to determine from the allegations if there is a timely failure to accommodate claim, at least during or related to PBAP, against NCCU. For example, although Keith-Foust alleges that NCCU failed to provide various accommodations throughout her enrollment in PBAP and that she "discussed her accommodations concerns with various defendants during her enrollment including Defendants Kesha Lee, Donna Kornegay, and Dean Corbett", (Am. Compl. ¶¶ 42-69, 99), she does not allege what "accommodations concerns" she discussed, which "accommodations concerns" she discussed with whom, when "during her enrollment" she discussed these "accommodations concerns", or what NCCU's response was to those discussions. Further, the parties have yet to argue whether a failure to accommodate occurred each day during PBAP that NCCU failed to provide various accommodations in the Accommodations Plan or whether a failure to accommodate occurred, if at all, only when Keith-Foust

22

renewed her request for an accommodation that was not being provided and NCCU subsequently failed to provide the accommodation. In other words, must Keith-Foust renew her request for an accommodation to trigger a possible failure to accommodate? The parties have also yet to argue, that if Keith-Foust is required to renew her request for accommodations, to whom she must make that renewed request such that NCCU would be responsible for a subsequent failure to accommodate. Nor have the parties argued, that if a renewed request is required, whether both the renewed request and the subsequent failure to provide the accommodation must occur on or after June 11, 2013 or whether it is sufficient that the subsequent failure to provide the accommodation occurred on or after June 11, 2013. The parties will need to address these outstanding issues, among others, prior to trial, whether in motions for summary judgment or otherwise, to determine what, if any, alleged failures to accommodate and other discriminatory conduct are timely.

In addition to challenging Keith-Foust's allegation that NCCU's discrimination was a continuing violation of the ADA and Rehabilitation Act, Defendants argue that Corbett's May 30, 2013 memorandum put Keith-Foust on notice of NCCU's accommodations decision and that "her alleged claim related to PBAP accommodations was complete as of the date of that memorandum – not the dates of PBAP." (Defs.' Mem. in Supp. at 10-11.) However, as alleged, while the memorandum "explained how some (but not all) of Plaintiff's accommodations under the Accommodations Plan would be implemented" and did "not mention"

oral descriptions of class videos, access to a table for equipment, and extended

time on assignments, it "never purport[ed] to alter or supersede [the]

Accommodations Plan." (Am. Compl. ¶¶ 73, 74, 75.)  It was not until Keith-Foust

began PBAP did she know what, if any, accommodations were not being provided,

which turned out to be more than just the three accommodations missing from the

memorandum.

In addition, Keith-Foust allegedly did not learn of Corbett's May 31, 2013 e-

mail to her writing instructor until one year later. (See id. ¶ 86.)  Therefore, this

allegedly intentional discriminatory act is timely.

III.

Defendants next argue that Keith-Foust fails to state a claim under the ADA

or Rehabilitation Act for discrimination or retaliation based on any events that fall

within the statute of limitations. (Defs.' Mem. in Supp. at 12.)  Despite this broad

statement, Defendants argue only that Keith-Foust "fails to state a discrimination

or retaliation claim for delayed accommodations or 'constructive discharge' from

the MPA class, based upon alleged FERPA violations, based upon settlement

discussions with NCCU or otherwise." (Defs.' Mem. in Supp. at 12.)  Presumably,

Defendants' narrow pleading challenge results from a belief that all allegations of

discrimination during and as a result of PBAP would be time-barred.

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.

24

Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in its favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).  Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557.

A.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Section 504 of the Rehabilitation provides the same protection from discrimination as Title II of the

25

ADA, but applies to programs such as a university receiving federal financial assistance. See 29 U.S.C. § 794(a), (b). Therefore,

> [i]n general, a plaintiff seeking recovery for violation of either statute must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability.

Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); see also Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 502 n.4 (4th Cir. 2016) (explaining that "[c]laims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same'" and noting that "Congress has directed courts to construe the ADA to grant as least as much protection as the Rehabilitation Act and its implementing regulations") (citations omitted). The Fourth Circuit has recognized "three distinct grounds for relief [as to the third prong of an ADA or Rehabilitation Act claim]: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." A Helping Hand, LLC. v. Baltimore Cty., 515 F.3d 356, 362 (2008). Defendants focus their challenge on Keith-Foust's failure to allege sufficient facts to support the third prong. (See Defs.' Mem. in Supp. at 12-14.)

### 1.

Specifically, they first note that Keith-Foust does not allege that NCCU failed to accommodate her during her MPA class, but that NCCU delayed its provision of

26

those accommodations. (Id. at 13.) According to the Amended Complaint, NCCU failed to provide electronic copies of course materials before the start of class "until [Keith-Foust] notified it on four separate occasions that she was not being provided this accommodation." (Am. Compl. ¶ 114.) NCCU did not provide a CCTV to Keith-Foust "until months into the fall 2013 semester." (Id. ¶ 116.) When Keith-Foust returned for the fall 2014 semester, NCCU "failed to provide [her] the course materials she required until three weeks after the start of classes." (Id. ¶ 123.) Defendants argue that these allegations do not show intentional discrimination or denial of overall benefits of the MPA class, "much less that any deprivation resulted from a lack of accommodations rather than her decision to leave due to medical issues." (Defs.' Mem. in Supp. at 13.) At least for purposes of Defendants' Rule 12(b)(6) challenge, this argument does not prevail.

Keith-Foust alleges that NCCU determined that she required various accommodations for her MPA class. (See Am. Compl. ¶¶ 112, 120; Accommodations Plan Fall 2013; Accommodations Plan Fall 2014.) Those accommodations included the provision of electronic copies of course materials before the start of each class, something that had been required for PBAP, and provision of a CCTV. (Am. Compl. ¶¶ 113, 115, 120.) Although Keith-Foust does not explicitly allege in the context of her MPA class the resulting injury when she was not timely provided electronic copies of course materials, she did make clear in the context of her PBAP courses that, even when she received the materials immediately before the start of class, her ability to participate meaningfully in the

27

class was inhibited, (see id. ¶ 49), a plausible injury in her MPA class, as well. She does specifically allege injury for the delay in receipt of a CCTV for her MPA course. Not only was she unable to view course materials written on the board without the assistance of a CCTV, but "[b]ecause [she] was not provided with the appropriate magnification equipment, [she] suffered additional unnecessary strain on her eyes." (Id. ¶¶ 117, 118.) "As a result of this eye strain, [she] had to take leave from school during the fall of 2013." (Id. 119.) As a "direct result of NCCU's failure to provide reasonable accommodations which made [Keith-Foust's] continued participation in the MPA class intolerable[,]" she took medical leave in October 2014. (Id. ¶¶ 124, 125.)

As alleged, NCCU's failure, at the start of both the fall 2013 and fall 2014 semesters, to provide electronic copies of course materials before class, which had earlier inhibited Keith-Foust's meaningful participation in PBAP, created an intolerable environment for Keith-Foust and resulted in her medical leave from the program. Similarly, as alleged, NCCU's failure to provide a CCTV until months into the fall 2013 semester prevented Keith-Foust from viewing much of the course material during that time and caused additional unnecessary strain on her eyes that caused her to take leave in the fall of 2013. Although Defendants' argument that Keith-Foust's allegation of intentional discrimination is conclusory may very well be true, she has nevertheless otherwise sufficiently alleged that she was denied the benefits of the MPA course on the basis of her visual impairment. See ADA Div., Office of Legal Counsel, EEOC Enforcement Guidance: Reasonable

28

Accommodation & Undue Hardship Under the ADA (2002) (explaining that an "employer should act promptly to provide the reasonable accommodation" and that "[u]nnecessary delays can result in a violation of the ADA").

2.

Also as part of their challenge to Keith-Foust's allegations of delayed accommodations in her MPA class, Defendants argue, "[T]o the extent that Plaintiff attempts to assert a novel claim for 'constructive discharge' from her MPA class, she should not be permitted to do so." (Defs.' Mem. in Supp. at 13 (citing Am. Compl. ¶ 127 ("Plaintiff was constructively discharged from the MPA class, based on the intolerable conditions imposed by NCCU due to its intentional failure to provide reasonable accommodations.").)  Defendants argue that "[a]llowing students who choose to leave school or drop a class for a host of reasons to allege 'constructive discharge' would open the floodgates for litigation[,]" but Defendants cite no case law in support of their argument. (See Defs.' Mem. in Supp. at 13.) Unfortunately, Keith-Foust does not respond with any case law of her own on this point. (See Pl.'s Resp. Mem. at 12.)  To be sure, this seems to be a unique allegation considering the dearth of case law on the propriety of such an allegation in the education setting where a plaintiff has alleged violations of the ADA and Rehabilitation Act.[9] Cf. Buescher v. Baldwin Wallace Univ., 86 F. Supp. 3d 789,

---

[9] A plaintiff alleging constructive discharge, at least in the employment context, must allege that she "was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and "that [she] actually resigned." Green v. Brennan, ___ U.S. ___, 136 S. Ct.

807 (N.D. Oh. 2015) (granting summary judgment on claim of constructive

dismissal from nursing program where, among other things, the plaintiffs did "not

demonstrate that a cause of action for constructive dismissal exists outside the

employment context"); Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp. 2d

332, 381-82 (W.D. Pa. 2008) (describing a claim for constructive expulsion under

Title IX as "a matter of first impression within the federal system" but noting that

despite its "potential viability", the concept was redundant because Title IX already

provided remedies for sexual harassment and retaliation). But see Raymond v.

Univ. of Houston, No. H-05-4149, 2009 WL 4604648, *15 (S.D. Tex. Dec. 3,

2009) ("Constructive dismissal from a doctoral program is tantamount to an

adverse action by a university, sufficient to meet the third element of a

discrimination claim" under Title IX.)  Defendants' argument and the reasoning

behind the Buescher and Dawn L. courts are persuasive.  Not only has Keith-Foust

failed to demonstrate that this cause of action exists in this context, but the

concept is redundant because the ADA and Rehabilitation Act already provide her

remedies for disability discrimination in an education setting, remedies that she is

pursuing in the instant action.  Therefore, to the extent that Keith-Foust attempts

---

1769, 1777 (2016); see also Rome v. Dev. Alts., Inc., 587 F. App'x 38, 40 (4th
Cir. Oct. 8, 2014) (unpublished) (citing Freeman v. Dal-Tile Corp., 750 F.3d 413,
425 (4th Cir. 2014) for the proposition that, at least in the employment context, a
plaintiff asserting constructive discharge must allege "(1) the deliberateness of the
employer's actions, motivated by unlawful bias, and (2) the objective intolerability
of the working conditions").

to assert a constructive discharge claim as part of her ADA or Rehabilitation Act claim, it is dismissed.

3.

Defendants also challenge the sufficiency of Keith-Foust's allegations that she was denied meaningful access to the university when she had to walk around the building or cross the street due to locked doors and that there were no safety rails. (Defs.' Mem. in Supp. at 14.)  Defendants argue that Keith-Foust has not alleged that these circumstances denied her the opportunity to participate or constituted intentional discrimination. (Id.)  While there are cases in which allegations such as Keith-Foust's may support a discrimination claim, this is not one of them because she has not alleged any injury.

In Adams v. Montgomery Coll. (Rockville), 834 F. Supp. 2d 386, 388 (D. Md. 2011), the college that the disabled plaintiff attended was undergoing construction during which time it failed to provide sufficient handicap parking, the plaintiff could not park near her classes, and the campus shuttle was not handicap accessible.  At the plaintiff's request, the college agreed to have campus security drive her from her vehicle to classes and back until the college could otherwise accommodate her disability. Id.  Campus security drove the plaintiff to her class one day, but would not drive her back to her vehicle or provide any future transportation. Id. at 388-89.  After suffering an injury walking back to her vehicle, she sued the college and others for, among other things, violations of the ADA and Rehabilitation Act. Id. at 389.  The court found that the plaintiff sufficiently pled

31

that she was excluded from the benefits of her education, including access to her classroom, solely on the basis of her disability, even though she was enrolled in the college, took classes there, and attended at least one class on the day in question. Id. at 392, 393.

Here, Keith-Foust alleges that the doors closest to the handicapped parking at the Criminal Justice Building where her MPA class was held in the fall of 2013 remained lock, requiring her either to walk around the entire building for access or to park across the street from the building, which posed a safety hazard. (Am. Compl. ¶ 133.) According to Keith-Foust, NCCU denied her meaningful access to its buildings where her classes were held and thereby excluded her from its programs or otherwise denied her the benefits of the programs. (Id. ¶¶ 155, 158.) She also alleges that NCCU denied her meaningful access to its buildings by failing to provide safety railings on stairs outside the buildings and/or on the porch of the Taylor Building[10] which posed a serious hazard, thereby excluding her from its programs or otherwise denying her the benefits of the programs. (Id. ¶¶ 134, 156, 158.) Unlike the plaintiff in Adams who alleged that she was injured while walking to her car, Keith-Foust has not alleged any injury as a result of walking around the building or that any injury arose from the potential safety hazards of parking across the street or taking classes in a building where railings were missing from a set of

---

[10] While Keith-Foust alleges in paragraph 134 that the porch on the Taylor Building was without safety rails, she then alleges that the stairs outside buildings did not have safety rails and does not refer to the Taylor Building porch. (Compare Am. Compl. ¶ 134 (porch) with id. ¶ 156 (outside stairs).)

stairs or a porch, nor has she alleged that she missed class or was prevented from getting to class timely or that her ability to prepare for or participate in classes or related programs was impinged by the parking or lack of railings. Therefore, as to these allegations concerning facilities, Keith-Foust has failed to sufficiently allege that she was excluded from participation in or denied the benefits of a program or otherwise intentionally discriminated against.

4.

Defendants also assert as part of their argument that Keith-Foust otherwise fails to state an ADA or Rehabilitation Act claim that she "improperly makes assertions in her complaint related to settlement discussions[,]" citing to paragraphs 132 through 134 of the Amended Complaint, and concluding that "[i]n any event, allegations of NCCU's 'ratification' of prior acts do not state any legal violation." (Defs.' Mem. in Supp. at 14.) However, in those cited paragraphs, Keith-Foust alleges the injury from having to request a key from security to use the elevator, (Am. Compl. ¶ 132), circumstances surrounding locked building doors, (id. ¶ 133), and the lack of porch railings, (id. ¶ 134), none of which relates to settlement discussions. It is possible that Defendants are referring to allegations about a March 2015 communication from NCCU which Keith-Foust does allege ratifies Corbett's May 30, 2013 decision. (See id. ¶¶ 88-91.) At least on their face, though, these allegations do not appear to reveal any settlement discussions. Further, Defendants have provided no argument, law, or analysis of why their conclusory statement that "allegations of NCCU's 'ratification'" states no "legal

33

violation." Therefore, both of these purported challenges to the Amended Complaint fail at this stage.

B.

To state a claim for retaliation under either the ADA or Rehabilitation Act, a plaintiff must "allege (1) that she has engaged in conduct protected by the ADA [or the Rehabilitation Act]; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002).

1.

Defendants first focus their challenge on Keith-Foust's allegation of retaliation in the MPA class and argue that she failed to link alleged delays to retaliatory intent and that such alleged delays by one professor would not deter a reasonable student from asserting her rights. (Defs.' Mem. in Supp. at 14.) As part of her allegations of retaliation by nearly all Defendants, Keith-Foust alleges that "Defendant Darryl Lester[, an adjunct professor in the MPA program,] interfered with [her] enjoyment of her right to receive the required and reasonable accommodation of access to materials before the start of class by denying this accommodation after [she] complained to university officials about [his] failure to provide this accommodation." (Am. Compl. ¶¶ 7, 159.) However, she also alleges that despite the delay in accommodations during her MPA program, she was ultimately provided electronic course materials before class. (Id. ¶¶ 112-14, 120-

34

23.)  In sum, as to Lester's conduct, Keith-Foust alleges that, even after she complained to NCCU officials that Lester was not providing her course materials in electronic form before class, Lester continued not to provide those materials until the point in time when he did begin providing those materials as requested.  These allegations do not sufficiently state a retaliation claim.

2.

Next, Defendants argue that Keith-Foust "cannot state a claim related to education records" because "FERPA [the Family Educational Rights and Privacy Act] governs Plaintiff's records request, but does not create a private right of action." (Defs.' Mem. in Supp. at 14 (citing Am. Compl. ¶ 158 (alleging as part of the retaliation claim that "NCCU and UNC interfered with [her] enjoyment of her right to seek relief for NCCU discrimination against her on the basis of her disability through withholding her records in excess of the required timeline under [FERPA], 20 U.S.C. § 1232g") and Gonzaga Univ. v. Doe, 536 U.S. 273, 290-91 (2002)).) They further argue that Keith-Foust had legal representation and did not allege any material harm or retaliatory intent by the person responding to the request. (Id.)

In Gonzaga, the Supreme Court determined that the non-disclosure provisions of FERPA, 20 U.S.C. § 1232(g)(b), create no personal rights to enforce. 536 U.S. at 276.  Applying the Gonzaga Court's analysis to the records-access provisions of FERPA, 20 U.S.C. § 1232(g)(a), courts have determined that they likewise create no personal rights to enforce. See, e.g., Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 782-86 (2d Cir. 2002) (Sotomayor, J.); Robbins v. DePaul

35

Univ., No. 13C06276, 2014 WL 7403381, *3 (N.D. Ill. Dec. 29, 2014) (applying Gonzaga, Taylor, and Chicago Tribune Co. v. Bd. of Trs. of Univ. of Ill., 680 F.3d 1001, 1005 (7th Cir. 2012), and finding no private right of action under § 1232g(a)(1)(A) which the plaintiff alleged the university violated by not responding in a timely manner to her request for access to her student records). Therefore, to the extent that Keith-Foust relies on an alleged violation of FERPA in support of her claims of retaliation in violation of the ADA and Rehabilitation Act, FERPA provides no such private right of action.

IV.

Defendants next argue that Keith-Foust cannot state an ADA or Rehabilitation Act claim against individual defendants, either in their individual or official capacities. (Defs.' Mem. in Supp. at 15.) Keith-Foust does not dispute this, and correctly so. First, the ADA and Rehabilitation Act do not provide causes of action against individual defendants in their individual capacities. Baird ex rel. Baird v. Rose, 192 F.3d 462, 472 (4th Cir. 1999) (explaining that the plaintiff suing on behalf of her student-daughter for violations of Title II of the ADA that the ADA does not provide a remedy against private individuals because Congress made the remedies in Title VII, which does not authorize a remedy against individuals, applicable to ADA actions and citing for comparison Hiler v. Brown, 177 F.3d 542, 545-46 (6th Cir. 1999) for a similar explanation as to why the Rehabilitation Act does not permit actions against individual defendants in their individual capacities);

36

<u>Smith v. Potter</u>, No. 1:09CV587, 2010 WL 1500876, *3 (M.D.N.C. Apr. 14, 2010) (citing cases finding the same).

Second, "[a] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office." <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989); <u>see also</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 783 (4th Cir. 2004) (affirming the district court's dismissal of the claim against an individual in his official capacity as superintendent because it was duplicative of the claim against the Board).  Further, as Defendants argue, the official capacity claims are also subject to dismissal because Keith-Foust is not seeking injunctive relief from the individuals in their official capacities. <u>See</u> <u>Lytle v. Griffith</u>, 240 F.3d 404, 408 (4th Cir. 2001) (noting that a "well-recognized exception to this rule [that a suit against a state official in his official capacity is really a suit against the official's office] is found, however, in <u>Ex parte Young</u>, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908), which allows suits against state officers for prospective equitable relief from ongoing violations of federal law"). Defendants are correct in that Keith-Foust does not request equitable relief, but instead seeks compensatory damages and attorney's fees for the alleged violations of the ADA and Rehabilitation Act. (<u>See</u> Am. Compl. ¶¶ 160[11], 152[12], 164 & "PRAYER FOR RELIEF".)  Therefore, the ADA and Rehabilitation Act claims against

---

[11] This reference is to the first paragraph numbered 160 and is on page 24 of the Amended Complaint.
[12] This reference is to the second paragraph numbered 152 and is on page 25 of the Amended Complaint.

the individual defendants in both their individual and official capacities are dismissed.

## V.

Next, Defendants argue that NCCU, UNC, and the individual defendants in their official capacities are immune from Keith-Foust's claims of tortious interference with contract, fraud, negligence, negligent misrepresentation, and unfair and deceptive trade practices. (Defs.' Mem. in Supp. at 16-17.)  Keith-Foust does not appear to dispute this as she makes no argument in opposition to dismissal of these counts against these defendants in their official capacities on the basis of this immunity[13].  Pursuant to the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens . . .", Edelman v. Jordan, 415 U.S. 651, 663 (1974).  This immunity also applies to "state agents and state instrumentalities", Regents of the University of California v. Doe, 519 U.S. 425, 429 (1997), the latter of which includes the constituent institutions of the University of North Carolina, see Kirby v. North Carolina State University, No. 5:13-CV-850-FL, 2015 WL 1036946, *3 (E.D.N.C. Mar. 10, 2015) (citing Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1138 (4th Cir. 1990)).  Specifically, "NCCU qualifies as a state institution"; thus, "NCCU and its officials generally enjoy the protection of the Eleventh

---

[13] Keith-Foust does, however, argue that public official immunity, which is explained in Section V.A., does not shield Corbett from liability. (See Pl.'s Resp. Mem. at 16.)

38

Amendment immunity from liabilities that must be paid from public funds." Hooper v. North Carolina, 379 F. Supp. 2d 804, 812 (M.D.N.C. 2005) (citing N.C. Gen. Stat. §§ 150B-2(1a), 116-4.)

There are exceptions to the protections of the Eleventh Amendment. Congress can abrogate that immunity, Litman v. George Mason University, 186 F.3d 544, 549-50 (4th Cir. 1999), and a state may waive its Eleventh Amendment immunity by consenting to suit in federal court, id. at 550. Congress abrogates a state's Eleventh Amendment immunity "when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." Lee-Thomas v. Prince George's Cty. Pub. Sch., 666 F.3d 244, 249 (4th Cir. 2012). A state waives its immunity "'only where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" Huang, 902 F.2d at 1138-39 (quoting Edelman, 415 U.S. at 673). None of these exceptions applies here.

In contexts similar to that in the instant action, courts have found that North Carolina has not waived its immunity. In Huang, the court found that North Carolina did not waive immunity when it enacted N.C. Gen. Stat. § 116-3, which provided that the Board of Governors of the University of North Carolina "shall be able and capable in law to sue and be sued in all courts whatsoever." Id. at 1138 n.4, 1139. Not only does the statute contain no express language waiving the state's immunity, there is no "language [to] justify any inference of a waiver", and "it lacks any indication that North Carolina consented to suit in federal court." Id.

39

at 1139.  In both Hooper and Alston v. North Carolina A&T State University, 304

F. Supp. 2d 774, 783 (M.D.N.C. 2004), the court explained that neither the State

Tort Claims Act, N.C. Gen. Stat. § 143-291, nor a university's purchase of liability

insurance waives its sovereign immunity from tort claims.  The State Tort Claims

Act "effects a limited waiver . . . for negligent acts committed by state employees

in their official capacities" but requires plaintiffs to "bring their claims before the

North Carolina Industrial Commission, not the district court."  Alston, 304 F. Supp.

2d at 783. "Under this scheme, North Carolina has not explicitly waived immunity

from state court proceedings with regard to torts by state employees." Id. (internal

quotations omitted); see also Dickinson, 91 F. Supp. 3d at 761-62 (explaining that

North Carolina is immune from tort liability unless it waives immunity, and that,

while the North Carolina Tort Claims Act provides a limited waiver for negligent

acts of its employees, suits based on intentional acts are prohibited).  Therefore,

NCCU, UNC, and the individual defendants sued in their official capacities are

immune from suit for tortious interference with contract, fraud, negligence, and

negligent misrepresentation.

As for Keith-Foust's claim of unfair and deceptive trade practices against

Corbett in his official capacity, that claim also fails because "[t]he consumer

protection and antitrust laws of Chapter 75 of the General Statutes do not create a

cause of action against the State, regardless of whether sovereign immunity may

exist." Sperry Corp. v. Patterson, 325 S.E.2d 642, 644 (N.C. Ct. App. 1985); cf.

Bd. of Governors of the Univ. of N.C. v. Helpingstine, 714 F. Supp. 167, 174

40

(M.D.N.C. 1989) (finding that the University of North Carolina at Chapel Hill, as an alter ego of the State of North Carolina, was "entitled to all the sovereign immunity that the State of North Carolina enjoys and that since such immunity has not been waived the University is protected against Defendants' counterclaim under Section 75-1.1"). Likewise, a claim against individuals in their official capacities for violations of General Statute § 75-1.1 is not permitted. Sperry Corp., 325 S.E.2d at 645. Therefore, here, Corbett is immune from suit in his official capacity for alleged unfair and deceptive trade practices.

## VI.

Next, Defendants argue that Keith-Foust's tort and unfair and deceptive trade practices claims fail to state claims for which relief can be granted, (Defs.' Mem. in Supp. at 17), and that the chancellor and deans are protected by public official immunity, (id. at 26-27).

## A.

Public official immunity affords protection from individual liability "[a]s long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption . . . ." Wilcox v. City of Asheville, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012) (citing Smith v. State, 222 S.E.2d 412, 430 (N.C. 1976) and citing In re Grad, 321 S.E.2d 888, 890 (N.C. 1984) as describing that "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he

41

intends to be prejudicial or injurious to another"). Public official immunity is not, however, a defense to intentional torts. Blackburn v. Town of Kernersville, No. 1:14CV560, 2016 WL 756535, at *10 (M.D.N.C. Feb. 25, 2016); Wells v. N.C. Dep't of Corr., 567 S.E.2d 803, 813 (N.C. Ct. App. 2002). But see Maney v. Fealy, 69 F. Supp. 3d 553, 564-65 (M.D.N.C. 2014) appeal filed sub nom., Maney v. Garrison, No. 14-7791 (4th Cir. Dec. 8, 2014) (recognizing the split in North Carolina state and federal courts over whether public official immunity is a defense to all intentional torts and finding that it may apply to battery which does not require malice).

North Carolina "courts distinguish between public employees and public officials in determining negligence liability." Farrell v. Transylvania Cty. Bd. of Educ., 625 S.E.2d 128, 133 (N.C. Ct. App. 2006) (internal quotations omitted). Public officials cannot be individually liable for negligently performing their governmental or discretionary duties, but public employees can. Wells, 567 S.E.2d at 813 (citing Meyer v. Walls, 489 S.E.2d 880, 888 (N.C. 1997)). Distinctions between a public official and a public employee include: "(1) a public office is a position created by the constitution or statutes; (2) a public official exercises a portion of the sovereign power; and (3) a public official exercises discretion, while public employees perform ministerial duties." Isenhour v. Hutto, 517 S.E.2d 121, 127 (N.C. 1999). The exercise of discretion requires "personal deliberation, decision[,] and judgment[,]" while the exercise of ministerial duties, which are "absolute", "involve[s] merely the execution of a specific duty arising from fixed

42

and designated facts." Id.  At this stage, it cannot be determined from the allegations in the Amended Complaint whether or not the chancellor or deans are public officials.  Nevertheless, as explained below, Keith-Foust fails to state claims against the individual defendants in their individual capacities.[14]

## B.

According to the case caption and the portion of the Amended Complaint entitled "THE PARTIES", Keith-Foust has sued each individual defendant in his or her official capacity, which claims are being dismissed, and individual capacity. (Am. Compl. ¶¶ 4-10.)  However, she does not allege in which capacity or capacities she asserts her various tort claims against those individual defendants nor does she specify precisely from which Defendant or in what capacity she seeks compensatory, special, punitive, or treble damages, fees and costs, or interest, (see id. "PRAYER FOR RELIEF").  Because Defendants have moved to dismiss these claims based on grounds in addition to sovereign immunity, they must have assumed Keith-Foust has alleged her tort claims against the individual defendants in both their official and individual capacities.  Furthermore, in their brief entitled "Reply in Support of Motion to Dismiss Amended Complaint", Defendants argue that, although Keith-Foust has asserted individual capacity claims, her allegations are actually based on the individuals' official acts. (See [Doc. #31].)  According to Defendants, under Martin v. Wood, 772 F.3d 192 (4th Cir. 2014), immunity bars

---

[14] See supra § III for the Rule 12(b)(6) standard.

the tort and unfair and deceptive trade practices claims because the acts or omissions at issue here were taken and could only be taken in the individual defendants' official capacities.

In Martin, a nurse formerly employed by a state-operated hospital sued her supervisors in their individual capacities for violations of the Fair Labor Standards Act and, to avoid sovereign immunity, did not sue the supervisors in their official capacities or the hospital. Id. at 193, 195. The defendants argued that the plaintiff was attempting to circumvent the Eleventh Amendment by naming them only in their individual capacities, but that, in reality she was suing them for actions taken in their official capacities on behalf of the hospital and, therefore, they were actually immune from suit. Id. at 195. The Fourth Circuit agreed. First, it recognized that "[w]hen [a] suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." Id. (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984)). Next, it noted the Supreme Court's

> caution[] that allowing an action to proceed simply because the complaint names a state official in his or her individual capacity "would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction."

Id. (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 270 (1997)). Therefore, "[r]esolution of the issue requires [the court] to look beyond the form of the complaint and the conclusory allegations . . . to determine who is the 'real, substantial party in interest.'" Id. at 196 (quoting Pennhurst State Sch. & Hosp.,

44

465 U.S. at 101.  A court is to look at "the substance of the claims stated in the complaint" to determine "the real, substantial party in interest".  Id.  When reviewing the substance of the claims, a court is to ask

> (1) were the allegedly unlawful actions of the state officials tied inextricably to their official duties; (2) if the state officials had authorized the desired relief at the outset, would the burden have been borne by the State; (3) would a judgment against the state officials be institutional and official in character, such that it would operate against the State; (4) were the actions of the state officials taken to further personal interests distinct from the State's interests; and (5) were the state officials' actions ultra vires[15].

Id. (internal citations and quotations omitted).

The Martin court found that nearly every factor indicated that the defendants were sued in their official capacities.  The complaint alleged that the hospital failed to pay her overtime "because [the defendants] refused to approve such compensation[,]" that the defendants "exercised authority to establish and control [her] hours of work at the hospital" and failed to include her overtime hours in their computation of her pay, and that they did so "directly and indirectly in the interest of [the hospital][16]."  Id.  Further, the complaint did not allege that the defendants acted in an ultra vires manner or in their personal interests distinct from the hospital's interests.  Id.  Therefore, because the defendants' actions were

---

[15] Ultra vires is defined as "[u]nauthorized; beyond the scope of power allowed or granted by a corporate charter or by law." Black's Law Dictionary (10th ed. 2014).
[16] The Fair Labor Standards Act, which requires an "employer" to compensate workers for overtime, defines an "employer" to include "any person acting directly or indirectly in the interest of an employer . . . ." 29 U.S.C. § 203(d).

inextricably tied to their official duties at the hospital, the state was the real party in interest and sovereign immunity dictated dismissal of the suit. Id.

Here, applying the Martin factors[17] to the substance of each of Keith-Foust's state law claims, it is clear that NCCU is the real, substantial party in interest. Notably, the foundation and backdrop of each of the state law claims is NCCU's alleged failure to accommodate Keith-Foust. (See, e.g., Am. Compl. "PRELIMINARY STATEMENT" ("NCCU's failure to accommodate Plaintiff's disability"), ¶ 42 ("NCCU failed to accommodate Plaintiff's disability during her enrollment in PBAP" & "NCCU did not provide Plaintiff all the accommodations agreed to in the Accommodations Plan"), ¶ 43 ("NCCU did not provide Plaintiff with special seating . . ."), ¶ 44 ("NCCU's denial of special seating . . ."), ¶ 45 ("NCCU failed to make available to Plaintiff access to a table . . ."), ¶ 47 ("NCCU failed to provide Plaintiff access to special seating . . ."), ¶ 48 ("NCCU sometimes provided Plaintiff class materials before the start of class . . ."), ¶ 50 ("NCCU failed to provide Plaintiff access to her personal equipment and extended time on assignments . . ."), ¶¶ 54-56 (during oral argument, "NCCU failed to provide Plaintiff access to a table[,] . . . access to an electrical outlet[,] . . . [and] extended time . . ."), ¶ 57 ("NCCU's failure to make this accommodation available to Plaintiff . . ."), ¶ 61 ("NCCU's failure to accommodate Plaintiff properly during the

_____

[17] It is not entirely clear whether a judgement here against the state officials would be institutional and official in character such that it would operate against the state. Therefore, this factor does not help determine which party is the real, substantial party in interest and is not analyzed further.

46

tutoring sessions . . ."), ¶ 70 ("NCCU intentionally discriminated against Plaintiff

. . ."), ¶ 97 ("NCCU did not provide her required accommodations during PBAP

. . ."), ¶ 114 ("NCCU failed to provide this accommodation . . ."), & ¶¶ 128, 129

("NCCU's discrimination against Plaintiff on the basis of her disability . . .").  As

explained above, <u>supra</u> § IV, neither the ADA nor the Rehabilitation Act provide for

relief against individuals.  In an apparent attempt to circumvent that protection

from liability, Keith-Foust has alleged various state law claims premised on

disability discrimination against the individual defendants in their individual

capacities.

### 1.

First, Keith-Foust alleges a claim against Corbett for tortious interference

with contract and prospective contract.  She alleges, among other things, that

Corbett was the Associate Dean for Academic Affairs at NCCU School of Law "at

the relevant times", (Am. Compl. ¶ 4); he "electronically mailed Plaintiff a

memorandum on the Law School's letterhead" on May 30, the purpose of which

was to provide her with "an overview of PBAP and to outline how her

Accommodations Plan would be implemented", (<u>id.</u> ¶¶ 71, 72); and he explained in

a May 31 e-mail to her writing instructor that he "purposely omitted" the

accommodation of extended time on assignments because it was an "impractical

request", it was "better to discourage" her from the idea of receiving extended

time on assignments so that there would not "be an expectation later", and that he

did not believe she was being realistic about expectations and that law school was

not the route for her, (id. ¶¶ 76-79). Further, "[a]s a dean of the law school, Defendant Dean Corbett knew of Plaintiff's contract with Defendant NCCU" which he induced NCCU to breach. (Id. ¶¶ 168, 169.) Similarly, "[a]s a dean of the law program, [he] had knowledge of the relationship between Plaintiff and Defendant NCCU" and induced NCCU not to offer her admission into the law school. (Id. ¶¶ 179, 180.)

The substance of these allegations against Corbett reflects that his allegedly unlawful actions were "tied inextricably to [his] official duties[.]" At all relevant times, he was Associate Dean for Academic Affairs for the law school and, according to the allegations, acted in that capacity towards Keith-Foust. He wrote a memorandum on the law school's letterhead explaining PBAP and the implementation of the Accommodations Plan, and there is no allegation that these duties were not among his responsibilities as a dean. Furthermore, had Corbett not omitted accommodations from his memorandum, NCCU would have borne the burden of providing those. Corbett is not alleged to have acted to further his personal interests distinct from those of NCCU. Instead, he allegedly purposely omitted the accommodation of extended time on assignments because he did not want it to become an expectation of Keith-Foust, and he expressed that did not believe law school was the route for her – statements having nothing to do with his own personal interests. Furthermore, Keith-Foust's allegations that Corbett lacked the authority to make a final determination as to the reasonableness of her accommodations and to refuse to implement the accommodations previously

48

deemed reasonable and necessary, (see id. ¶ 84), are conclusory, as is the allegation that his inducement was in excess of his legal authority, (id. ¶ 172). Furthermore, her allegation that the purpose of Corbett's inducement was to harm her based on her disability, (id. ¶¶ 171, 181), is not plausible as alleged, as there are no allegations as to why he would seek to do so when, in fact, he set out to explain to her how her Accommodations Plan was to be implemented, albeit not in its entirety, during PBAP. In sum, the Martin factors reveal that, although Corbett is sued in his individual capacity for tortious interference, NCCU is the real, substantial party in interest, and it is protected from suit on this claim, see supra § V.[18]

2.

Next, Keith-Foust alleges that Corbett and Chancellor Saunders-White committed fraud. The factual allegations in support of this claim against Corbett are essentially the same as those in support of the tortious interference claim – that he purposely and unlawfully excluded three accommodations, he failed to inform Keith-Foust that the purpose of his memorandum was to unlawfully refuse to implement her Accommodations Plan, she enrolled in PBAP believing that all of her accommodations would be provided, he induced her writing instructors not to

---

[18] Even if Corbett had been the proper party in interest, Keith-Foust fails to state a claim of tortious interference against him. See Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 784 S.E.2d 457, 463 (N.C. 2016) (explaining a claim for tortious interference with prospective contract); Embree Constr. Grp., Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (1992) (providing the elements and an explanation of tortious interference with contract).

provide the accommodation of extended time on assignments, "[a]s a Dean of Academic Affairs, Defendant Dean Corbett's commentary carries great weight and influence upon faculty members within the law school", and she would not have enrolled had she known of Corbett's conduct, (id. ¶¶ 184-98). Against Saunders-White, Keith-Foust alleges that Saunders-White was Chancellor at NCCU at the relevant times and that, when Keith-Foust e-mailed Corbett and copied Saunders-White after she had been denied admission into the law school and Corbett responded and copied Saunders-White that there was no appeal process or hearing for admission denials, Saunders-White concealed the material fact that Keith-Foust could appeal when Saunders-White failed to correct Corbett's statement. (Id. ¶¶ 6, 102-04[19], 203.)

Applying the Martin factors to the fraud claim reveals that NCCU is the real, substantial party in interest, not Corbett or Saunders-White. As alleged, the actions of Corbett are tied inextricably to his official duties; had the accommodations been provided, NCCU would have borne the burden; there are no allegations that his actions were taken to further personal interests distinct from NCCU's; and any allegations of actions lacking authority are conclusory, as described above. As for Saunders-White, she was copied on Keith-Foust's and

---

[19] Keith-Foust alleges that she requested the appeal because she believed she was discriminated against during PBAP and that her evaluation was based on that discrimination. (Am. Compl. ¶ 102.) She does not allege, however, that she told Corbett or those copied on the e-mail that was the reason for her hearing request. (See id. ¶¶ 101-03.)

Corbett's e-mails in her role as University chancellor, and the knowledge attributed to her of NCCU's grievance policies for students with disabilities can only plausibly be attributed to her in her capacity as the chancellor. Furthermore, had she corrected Corbett and afforded Keith-Foust the opportunity to participate in the grievance procedure, NCCU would have borne that burden. There are no allegations that Saunders-White acted in any way to further her personal interests distinct from NCCU's or that she acted without authority. Therefore, NCCU is the real, substantial party in interest, and it is immune from suit on this claim, see supra § V.[20]

3.

Next, Keith-Foust alleges negligence against Lee, Kornegay, Lester, Craig-Taylor, and Williams. She alleges that Lee was Director of Student Disability Services at the relevant times; Kornegay was Director of Wellness at the School of Law and liaison to Student Disability Services at the relevant times; they both owed Keith-Foust a duty to ensure she was accommodated; and their "duty arose through undertaking the active course of conduct of designating the appropriate accommodations that were required for Plaintiff's participation in PBAP[,] . . . communicating with Plaintiff during PBAP [and the MPA program] regarding the

---

[20] Even if Corbett and Saunders-White were the real, substantial parties in interest, Keith-Foust fails to state a claim for fraud against either defendant. Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F. Supp. 2d 471, 477 (E.D.N.C. 2013) (providing the elements of fraud by omission); Forbis v. Neal, 649 S.E.2d 382, 387 (N.C. 2007) (providing the elements of fraud).

implementation of [her] accommodations[,] . . . [and] under the ADA and Section 504 statutes." (Id. ¶¶ 5, 8, 207-11.)  They allegedly breached their duties when they failed to provide or ensure the provision of special seating, access to a table for her equipment in the front of class, extended time on assignments, oral descriptions of videos shown in class, class materials in electronic form before tutoring sessions and class, and access to personal equipment. (Id. ¶¶ 214-21.) Lee also breached her duty by failing to provide or ensure provision of class materials in electronic form before Keith-Foust's MPA class. (Id. ¶ 222.)

Lester was an adjunct professor in the MPA program at the relevant times and allegedly had a duty, which he breached, to ensure Keith-Foust was provided her required accommodations, a duty that arose through "educating a disabled student at a university with a legal obligation to accommodate students with disabilities[,]" communicating with her about receiving class materials in electronic form before class, and the ADA and Section 504 of the Rehabilitation Act. (Id. ¶¶ 7, 223-27.)

Craig-Taylor was Dean of the School of Law at the relevant times and allegedly had a duty to ensure that Keith-Foust was provided reasonable accommodations during PBAP, a duty that arose through her role as dean of the law school and under the ADA and Section 504 of the Rehabilitation Act. (Id. ¶¶ 10, 228-30.)  She allegedly breached this duty by failing to provide or ensure that Keith-Foust was provided her accommodations in the Accommodations Plan and by failing to accept Keith-Foust's grievance. (Id. ¶¶ 231-32.)

52

Williams was Assistant Dean of Admissions at the School of Law and allegedly had a duty to ensure that Keith-Foust was provided her required accommodations, a duty that arose through her role as interim associate dean of admissions and under the ADA and Section 504 of the Rehabilitation Act. (Id. ¶¶ 9, 233-35.) She allegedly breached her duty by failing to provide or ensure that Keith-Foust was provided her accommodations in the Accommodations Plan, by failing to inform Keith-Foust of the opportunity to file a grievance, and by not correcting Corbett's representation that she could not appeal. (Id. ¶¶ 237-39.)

As is abundantly clear from the allegations, NCCU is the real, substantial party in interest in this negligence claim. Each defendant's allegedly negligent conduct was either the failure to provide or ensure the provision of required accommodations, the failure to inform Keith-Foust of the grievance procedure, or both. The defendants' alleged duties and breaches were tied inextricably to their official duties as Director of Student Disability Services, Director of Wellness at the School of Law, adjunct MPA professor, Dean of the School of Law, and Assistant Dean of Admissions at the School of Law, respectively. As explained above, had Keith-Foust been provided all accommodations and the opportunity to participate in the grievance procedures, NCCU would have borne those burdens. There are no allegations that any of these defendants acted to further their personal interests distinct from NCCU's or that they acted without authority to do so. Even more so than Keith-Foust's other allegations, these negligence allegations sound in ADA and Rehabilitation Act claims, which Keith-Foust seemingly acknowledges by

53

alleging that the defendants' duties arose under the ADA and Section 504 of the Rehabilitation Act. Those ADA and Rehabilitation Act claims can only be asserted against NCCU. Under the Martin factors, NCCU is the real, substantial party in interest for the negligence claim from which it is immune, see supra § V.[21]

4.

Keith-Foust next alleges a claim of negligent misrepresentation against Lee and Kornegay. Despite allegedly owing Keith-Foust a duty of care, neither prepared the Accommodations Plan with reasonable care. (Id. ¶¶ 247-48, 253-54.) "Because" Lee and Kornegay "serve as university representatives of the Student Disability Services office," Keith-Foust justifiably, and to her detriment, relied on their statement that the Accommodations Plan would be implemented. (Id. ¶¶ 249-50, 255.) For the same reasons as explained above, the substance of these allegations reveals that NCCU is the real, substantial party in interest, and it is immune from suit on this claim, see supra § V.[22]

5.

Finally, Keith-Foust alleges a claim of unfair and deceptive trade practices against Corbett. She alleges that Corbett's actions described previously did not

---

[21] For these same reasons, even if the individual defendants were the real, substantial parties in interest, Keith-Foust has not stated a claim for negligence. See Fussell v. N.C. Farm Bureau Mut. Ins. Co., Inc., 695 S.E.2d 437, 440 (N.C. 2010) (providing the elements of a negligence claim).

[22] Even if Lee and Kornegay were the proper defendants, Keith-Foust has failed to state a claim for negligent misrepresentation. See Raritan River Steel Co. v. Cherry, Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988) (providing the elements for a claim of negligent misrepresentation).

involve the application of his professional knowledge or skills, were unfair and deceptive, contravened and offended the established public policy of the ADA and Section 504 of the Rehabilitation Act, were unethical and injurious to Keith-Foust because they caused her to be discriminated against, deceived Keith-Foust because she believed her Accommodations Plan would be implemented, and affected commerce by inducing a breach of contract and resulting in economic harm to Keith-Foust. (Id. ¶¶ 259-64.)  For the same reasons explained above[23], NCCU is the real, substantial party in interest, and, as an agency of the state, cannot be sued for unfair and deceptive trade practices, see supra § V.  Furthermore, because Corbett was acting as a representative of NCCU when he allegedly acted unfairly and deceptively and the allegations of other tortious conduct on his part are not sufficiently pled, there can be no cause of action against him for unfair and deceptive trade practices.  "The whole thrust of [N.C. Gen. Stat. §] 75-1.1[24] as applied by North Carolina courts has been to afford protection from unethical acts by businesses or business persons, not to allow claims against state employees . . . ." Sperry Corp., 325 S.E.2d at 645 (dismissing the unfair and deceptive trade

---

[23] In addition to those reasons, the allegation here that Corbett's actions did not involve the application of his professional knowledge or skill because his "role as an NCCU employee did not include making determinations on whether to implement an approved accommodations plan developed by Defendant NCCU . . . [and did not] involve refusing to implement such accommodations plan . . . ", (Am. Compl. ¶ 264), is conclusory.

[24] See Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001) (providing the elements of a claim for violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq.); Ace Chem. Corp. v. DSI Transp., Inc., 446 S.E.2d 100, 106 (N.C. App. 1994) (defining acts that are unfair and deceptive).

practices claim against the Secretary of the Department of Administration in her individual capacity by an unsuccessful contract bidder where she acted as a representative of the state when dealing with the plaintiff, whether or not she exceeded her statutory authority at the time, and the plaintiff had not alleged fraudulent, corrupt, or otherwise tortious conduct on her part); see also F. Ray Moore Oil Co., Inc. v. State, 341 S.E.2d 371, 374 (N.C. Ct. App. 1986) ("The statute is aimed at unfair and deceptive practice by those engaged in business for profit.").

## VII.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Amended Complaint [Doc. #28] is denied in part and granted in part. Counts 1, 2, 3, and 4 are dismissed as to the individual defendants in their individual and official capacities; any alleged failure to accommodate prior to June 11, 2013 is time-barred; and certain specific allegations of discrimination or retaliation fail to support such claims, as explained in detail above. Counts 5, 6, 7, 8, and 9 are dismissed in their entirety.

This the 11th day of August, 2016.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge